**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| SHELLY OSGOOD on behalf of<br>herself and all others similarly<br>situated, | ) | |
| | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| EQUITY BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Shelly Osgood, on behalf of herself and all others similarly situated, by counsel, alleges:

### INTRODUCTION

1. Plaintiff brings this action on behalf of herself and a class of all others similarly situated against Defendant Equity Bank ("Equity") over a) the improper assessment and collection of Overdraft Fees ("OD Fees"), including fees on accounts that were never actually overdrawn, and b) the assessment of more than one insufficient funds fee ("NSF Fee") on the same item— practices that are in breach of Equity's contracts and its duty of good faith and fair dealing and have unjustly enriched Equity.

2. Through the imposition of these fees, Equity has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue. Plaintiff, like thousands of others, have fallen victim to Equity's fee revenue maximization scheme.

3. Plaintiff asserts this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself and all others similarly situated, for damages and other relief.

1

## PARTIES

4.     Plaintiff Shelly Osgood is a citizen and resident of the State of Missouri, residing in Independence, and has a checking account with Equity.

5.     Defendant Equity Bank is a stated-chartered bank with over 50 locations in Kansas, Missouri, Oklahoma, and Arkansas. Equity is incorporated in Kansas and its headquarters and principal place of business is in Andover, Kansas; therefore, it is a citizen of Kansas. Equity provides retail banking services to its customers, including Plaintiff and members of the proposed Class.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction, *inter alia*, pursuant to the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed Class is a citizen of a different state than Equity.

7.     Equity regularly and systematically conducts business and provides retail banking services in this district, and provides retail banking services to its customers, including Plaintiff Osgood and members of the putative class. As such, it is subject to the jurisdiction of this Court.

8.     Venue is likewise proper in this district pursuant to 28 U.S.C. § 1391 because Equity is subject to personal jurisdiction in this Court and regularly conducts business within this district through its multiple branches located within this district. In addition, a substantial part of the events giving rise to the claims asserted herein occurred and continue to occur in this district.

## I. EQUITY ASSESSES OVERDRAFT FEES ON ACCOUNTS THAT ARE NOT OVERDRAWN

### A. Overview of Claim

9. Plaintiff challenges Equity's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

10. Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Equity immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds available to cover these transactions because Equity has already sequestered these funds for payment.

11. However, Equity still assesses crippling OD Fees on many of these transactions, and mispresents its practices in its account documents.

12. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Equity later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN transactions.

13. Equity maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a

debit card, Equity sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

> Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations: When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 22, 2009).

14.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

15.     Still, despite keeping those held funds off-limits for other transactions, Equity improperly charges OD Fees on those APPSN Transactions, although the APPSN transactions *always* have sufficient available funds to be covered.

16.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and

4

when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

17.    There is no justification for these practices, other than to maximize Equity's overdraft fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Equity is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Equity was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

18.    Besides being deceptive, unfair, and unconscionable, these practices breach promises made in Equity's adhesion contracts—contracts which fundamentally misconstrue and

5

mislead consumers about the true nature of Equity's processes and practices. These practices also exploit contractual discretion to gouge consumers.

19.     In plain, clear, and simple language, the checking account contract documents covering overdraft fees promise that Equity will only charge OD Fees on transactions that have insufficient funds to "cover" that transaction.

20.     In short, Equity is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.     Mechanics of a Debit Card Transaction**

21.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Equity. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Equity, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

22.     At this step, if the transaction is approved, Equity immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

23.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

6

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 22, 2009).

24.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

25.    Equity (like all credit unions and banks) decides whether to "pay" debit card transactions at authorization.  After that, Equity is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point—when Equity may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

26.    There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### C.    Equity's Account Contract

27.    Plaintiff has an Equity checking account, which is governed by Equity's standardized Overdraft Disclosure, Ex. A, Courtesy Pay Agreement, Ex. B, Electronic Fund Transfer Agreement and Disclosure, Ex. C, and Terms and Conditions, Ex. D (collectively, the "Account Documents").

28.    The Overdraft Disclosure, Ex. A, states:

What You Need to Know About Overdrafts and Overdraft Fees. An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in different ways: We have standard overdraft practices (or Courtesy Pay) that come with your account. We also offer overdraft protection plans—such as linking to a savings, money market, or checking account or to a line of credit—which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans (/connect/contact-us). What are the standard overdraft practices that come with my account? We do authorize and pay overdrafts for the following types of transactions: Checks and other transactions made using your checking account number Automatic bill payments ACH Payments We do not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below): ATM transactions Everyday debit card transactions We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined.

29.     According to the Courtesy Pay Agreement, Ex. B:

There are several ways your account can become overdrawn, such as (1) the payment of checks, electronic funds transfers or other withdrawal requests; (2) payments authorized by you (i.e. signature-based point of sale transactions); (3) the return of unpaid items deposited by you; (4) bank service charges; or (5) the deposit of items which, according to the bank's Funds Availability Policy, are treated as not yet available or finally paid.

    […]

 [A]t your request, we may authorize and pay ATM transfers or withdrawals and everyday debit card purchases using your limit. Your available balance may be affected by authorizations which could create additional overdrafts and associated fees.

30.     In the Electronic Fund Transfer Agreement and Disclosure, Ex. C, the Bank states:

Purchases made with your POS Access Card, including any purchase where you receive cash, are referred to as "Point of Sale" or "POS" transactions and will cause your "designated account" to be debited for the amount of the purchase. The designated account for ATM Card transactions is your Checking, NOW, Money Market or Savings Account. The designated account for Standard Debit Card transactions is your Checking, NOW, Money Market or Savings Account. The designated account for Student Debit Card transactions is your Checking, NOW, Money Market or Savings Account. In addition, your Standard Debit Card, or Student Debit Card may be used at any merchant that accepts MasterCard® debit cards for the purchase of goods and services. Your card may also be used to obtain

cash from your designated account at participating financial institutions. Each time you use your POS Access Card, the amount of the transaction will be debited from your designated account. We have the right to return any check or other item drawn against your account to ensure there are funds available to pay for the transactions. We may, but do not have to, allow transactions which exceed your available account balance or, if applicable, your available overdraft protection. If we do, you agree to pay the overdraft.

31.     According to the Terms and Conditions, Ex. D:

A Temporary Debit Authorization Hold Affects Your Account Balance. On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase. Here is an example of how this can occur - assume for this example the following: (1) you have opted-in to our overdraft services for the payment of overdrafts on ATM and everyday debit card transactions, (2) we pay the overdraft, and (3) our overdraft fee is $35 per overdraft, but we do not charge the overdraft fee if the transaction overdraws the account by less than $10. You have $120 in your account. You swipe your card at the card reader on a gasoline pump. Since it is unclear what the final bill will be, the gas station's processing system immediately requests a hold on your account in a specified amount, for example, $80. Our processing system authorizes a temporary hold on your account in the amount of $80, and the gas station's processing system authorizes you to begin pumping gas. You fill your tank and the amount of gasoline you purchased is only $50. Our processing system shows that you have $40 in your account available for other transactions ($120 - $80 = $40) even though you would have $70 in your account available for other transactions if the amount of the temporary hold was equal to the amount of your purchase ($120 - $50 = $70). Later, another transaction you have authorized is presented for payment from your account in the amount of $60 (this could be a check you have written, another debit card transaction, an ACH debit or any other kind of payment request). This other transaction is presented before the amount of the temporary hold is adjusted to the amount of your purchase (remember, it may take up to three days for the adjustment to be made). Because the amount of this other transaction is greater than the amount our processing

9

system shows is available in your account, our payment of this transaction will result in an overdraft transaction. Because the transaction overdraws your account by $20, your account will be assessed the overdraft fee of $35 according to our overdraft fee policy. You will be charged this $35 fee according to our policy even though you would have had enough money in your account to cover the $60 transaction if your account had only been debited the amount of your purchase rather than the amount of the temporary hold or if the temporary hold had already been adjusted to the actual amount of your purchase. Overdrafts. You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

32.     For APPSN Transactions, for which necessary funds are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to pay those transactions, yet Equity assesses OD Fees on them anyway.

33.     The above promise indicates that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions.

34.     In fact, Equity actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to "post" those same transactions. Instead, it uses a secret posting process described below.

35.     The above contractual promise is untrue. Equity charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Equity may impose OD Fees on any APPSN Transactions.

10

36. The account documents misconstrue Equity's true debit card processing and overdraft practices.

37. First, and most fundamentally, Equity charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions.

38. Equity assesses OD Fees on APPSN Transactions that ***do*** have sufficient funds available to pay them throughout their lifecycle.

39. Equity's practice of charging OD Fees even when sufficient available funds exist to pay a transaction violates a contractual promise not to do so. This discrepancy between Equity's actual practice and the contract causes consumers like Plaintiff to incur more OD Fees than they should.

40. Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

41. This discrepancy between Equity's actual practices and the contract causes consumers to incur more OD Fees than they should.

42. In sum, there is a huge gap between Equity's practices as described in the account documents and Equity's practices in reality.

**D.    Plaintiff's Debit Card Transactions**

43. On numerous occasions, including on October 29, 2019 and November 12, 2019, Plaintiff was assessed OD Fees on debit card transactions that settled on that day, despite the fact that positive funds were deducted immediately, prior to that day, for the transactions on which Plaintiff was assessed an OD Fee.

**II.    EQUITY CHARGES TWO OR MORE FEES ON THE SAME ITEM**

44. Equity regularly assesses two or more NSF Fees on the *same* item.

11

45.     This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—does not undertake the practice of charging more than one NSF Fee on the same item when it is reprocessed. Instead, Chase charges one NSF Fee even if a transaction is resubmitted for payment multiple times.

46.     Equity's Account Documents never disclose this practice. To the contrary, Equity's Account Documents indicate it will only charge a single NSF Fee on an item.

**A.     Plaintiff's Experience**

47.     In support of her claims, Plaintiff offers an example of NSF Fees that should not have been assessed against her checking account. As alleged below, Equity: (a) reprocessed a previously declined item; and (b) charged a fee upon reprocessing.

48.     On November 7, 2019, Plaintiff attempted a single payment to Paypal via ACH.

49.      Equity rejected payment of that item due to insufficient funds in Plaintiff's account and charged her a $34.98 NSF Fee for doing so. Plaintiff does not dispute the initial fee, as it is allowed by Equity Account Documents.

50.     Seven days later, on November 14, 2019, Equity again processed the payment, and this time paid it into overdraft, and charged a *second* $34.98 fee—an OD Fee this time.

51.     In sum, Equity charged Plaintiff nearly $70 in fees to attempt to process a single payment.

52.     Plaintiff understood the payment to be a single item as is laid out in Equity's Account Documents, capable at most of receiving a single NSF Fee (if Equity returned it) or a single OD Fee (if Equity paid it).

**B.     The Imposition of Multiple Fees on a Single Item Violates Equity's Express Promises and Representations**

12

53. The Account Documents provide the general terms of Plaintiff's relationship with Equity and therein Equity makes explicit promises and representations regarding how transactions will be processed, as well as when NSF Fees and OD Fees may be assessed.

54. The Account Documents contain explicit terms indicating that fees will only be assessed once per item—defined as a customer request for payment or transfer—when in fact Equity regularly charges two or more fees per transaction or single item even though a customer only requested the payment or transfer once.

55. Equity's Account Documents indicate that a singular NSF Fee can be assessed on checks, ACH debits, and electronic payments.

56. Equity's Account Documents state that it will charge a single fee per item or transaction that is returned due to insufficient funds.

57. The same "item" cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

58. There is zero indication anywhere in the Account Documents that the same "item" or "transaction" is eligible to incur multiple NSF Fees.

59. The same "item" on an account cannot conceivably become a new "item" each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to reprocess it.

60. There is zero indication anywhere in the Account Documents that the same "item" is eligible to incur multiple fees.

61. The Fee Schedule, Ex. D, states:

Overdrafts and Returned Item Fees Charge Overdraft Charge/Return Check Charge
- each

13

You will be charged an Overdraft Charge for an overdraft item paid if your account's daily ending balance is overdrawn by more than $5.00.

You will be charged a Return Check Charge for each returned item. No more than $169.90 or five Overdraft or Return Check Charges will be applied on any one business day.

Overdraft Charge applies to overdrafts created by a check, in-person withdrawal, ATM withdrawal, Debit Card transactions or other electronic means.

Return Check Charge applies to an item returned due to insufficient funds.

62.     Even if Equity reprocesses an instruction for payment, it is still the same item. Equity's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

63.     The Account Documents described never discuss a circumstance where Equity may assess multiple NSF Fees for a single item that was returned for insufficient funds and later reprocessed one or more times and returned again.

64.     In sum, Equity promises that one NSF Fee will be assessed per electronic payment or check, and these terms must mean all iterations of the same instruction for payment. As such, Equity breached the contract when it charged more than one fee per item.

65.     Reasonable consumers understand any given authorization for payment to be one, singular "item" as that term is used in Equity's Account Documents.

66.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which Equity will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere does Equity disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor have Equity customers ever agree to such fees or practices.

14

67. Customers reasonably understand, based on the language of the Account Documents and Equity's other documents, that the Bank's reprocessing of checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger NSF Fees. In other words, it is always the same item.

68. Equity knows this. That is why in July, 2020 it updated its Terms and Conditions, Ex. E, to disclose its true multiple fee practice for the first time:

> Nonsufficient Funds (NSF) Fees. If an item drafted by you (such as a check) or a transaction you set up (such as a preauthorized transfer) is presented for payment in an amount that is more than the amount of money in your account, and we decide not to pay the item or transaction, you agree that we can charge you an NSF fee for returning the payment. Be aware that such an item or payment may be presented multiple times and that we do not monitor or control the number of times a transaction is presented for payment. You agree that we may charge you an NSF fee each time a payment is presented if the amount of money in your account is not sufficient to cover the payment, regardless of the number of times the payment is presented.

69. Banks and credit unions, like Equity, that employ this abusive practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their accountholders—something Equity never did here.

70. For example, First Hawaiian Bank engages in the same abusive practices as PCU, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://www. fhb.com/ en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_ RXP1.pdf (last accessed September 25, 2019) (emphasis added).

71. Klein Bank similarly states in its online banking agreement:
[W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn,

15

would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*Consumer and Small Business Online Access Agreement*, Klein Bank ¶ H,

https://www.kleinbankonline.com/bridge/disclosures/ib/disclose.html (last accessed September

25, 2019) (emphasis added).

71.     Central Pacific Bank, a leading bank in Hawai'i, states in its Fee Schedule under

the "MULTIPLE NSF FEES" subsection:

Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds.

*Miscellaneous Fee Schedule*, Central Pacific Bank 1 (Feb. 15, 2019),

https://www.centralpacificbank.com/PDFs/Miscellaneous-Fee-Schedule.aspx.

72.     BP Credit Union likewise states: "We may charge a fee each time an item is

submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result

of a returned item and resubmission(s) of the returned item."

73.     Regions Bank likewise states:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item.

https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf.

16

74.     First Financial Bank states, "Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). Each presentment is considered an item and will be charged accordingly." Special Handling/Electronic Banking Disclosures of Charges, First Financial Bank 2 (Aug. 2018), https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure _of_ Charges.pdf.

75.     Andrews Federal Credit Union states:

> You understand and agree that a merchant or other entity may make multiple attempts to resubmit a returned item for payment. Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to use for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

https://www.andrewsfcu.org/AndrewsFCU/media/Documents/Terms-and-Conditions_REBRANDED_Dec2019-Update.pdf

76.     Consumers Credit Union states:

> Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

https://www.myconsumers.org/docs/default-source/default-document-library/ccu_membership_booklet_complete.pdf?sfvrsn=6

77.     Wright Patt Credit Union states:

> Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and

17

represented regardless of the number of times an item is presented or represented to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

https://www.wpcu.coop/en-

us/PDFDocuments/Important%20Account%20Information%20Disclosure%20-%20WPCU.pdf

78.     Partners 1st Federal Credit Union states:

Consequently, because we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf

79.     Members First Credit Union states:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once** . . . we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment [.]

http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf

80.     Community Bank, N.A. states:

We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.

https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure.pdf

81.     RBC Bank states:

We may also charge against the Account an NSF fee for each item returned or rejected, including for multiple returns or rejections of the same item.

18

https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf

82.     Diamond Lakes Credit Union states:

Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item.

https://www.diamondlakesfcu.org/termsconditions.html

83.     Parkside Credit Union states:

If the Credit Union returns the item, you will be assessed an NSF Fee. Note that the Credit Union has no control over how many times an intended payee may resubmit the same check or other item to us for payment. In the event the same check or other item is presented for payment on more than one occasion, your account will be subject to an additional charge on each occasion that the item is presented for payment. There is no limit to the total fees the Credit Union may charge you for overdrawing your account.

https://www.parksidecu.org/_/kcms-doc/1043/44277/Membership-and-Account-Agreement.pdf?__cf_chl_captcha_tk__=add6ebea42df3385074decd4b16c1f86a8369dc9-1580427763-0-AfXmB7FcyYTqzK9oMNbMSKM6k5fnKS5Xf-z7p3Tv-Pt951tDs7wM8yaaIV06w718t2nomyWR1Q8COwgpfgE07FJWZUeFkJN6lxbXDZG1SvidTWh Ym9l85AbCd5afw2imyGdtdzKhXl9bQ9TYkjOlTVM4w8OFJOtE3wVIHrEITnQnSfoR5mZxM 5O0bu4f_FHoHiJj0XsjNkVoGblk0-lti6-gMn-Wcu_o87SGQW6dOUF2i6rHGiM_CkdI-ULanKI2NS3KlhkYAuNatN9Jdwr7Plc6oJozMbZQeczuO7VlbRnuCFD0tjzkw1lsnof7uaRvLRA kfKYi3wh0tUU1c_Y6N4aH1qN8SPftOn8TYJHO7OoILvpMfamNTqv_djpbUl3GVA

84.     Unlike all these other financial institutions, Equity provides no such disclosure, and in so doing, deceives its accountholders.

**III.     EQUITY BREACHES THE COVENANT OF GOOD FAITH AND FAIR DEALING**

85.     Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that Equity is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, Equity has a duty to honor transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties on the depositor.

86.     Here—in the adhesion agreements Equity foisted on Plaintiff and its other customers—Equity has provided itself numerous discretionary powers affecting customers' credit union accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Equity abuses that discretion to take money out of consumers' account without their permission and contrary to their reasonable expectations.

87.     Equity's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, Equity exploits contractual discretion to the detriment of accountholders when it uses these policies.

88.     Equity uses its discretion to define contract terms in a manner contrary to any reasonable, common sense understanding of those terms. In Equity's implied definition, a transaction is an overdraft transaction even if Equity sequesters sufficient available funds for that transaction at the time it is made.

89.     Moreover, Equity uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

20

90. Equity uses all of these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable consumer would believe could cause OD Fees.

91. In addition, the Bank acts contrary to reasonable expectations under the Account Documents when it construes the word "item" to mean each iteration of the same payment. This is a breach of Equity's implied covenant to engage in fair dealing and to act in good faith.

92. It was bad faith and totally outside Plaintiff's reasonable expectations for Equity to use its discretion to assess two or more fees for a single attempted payment.

93. When Equity charges multiple fees, Equity uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer expectations. Equity uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more NSF Fees.

## CLASS ALLEGATIONS

94. Plaintiff brings this action on behalf of herself and as a class action on behalf of the following proposed classes (the "Classes"):

> All Equity checking account holders who, during the applicable statute of limitations, were charged OD Fees on items that did not overdraw their checking accounts (the "OD Class")

> All Equity checking account holders who, during the applicable statute of limitations, were charged more than one NSF Fee, or an NSF Fee followed by an overdraft fee, on the same item (the "NSF Class")

95. Plaintiff reserves the right to modify or amend the definition of the Class as this litigation proceeds.

96. Excluded from the Class are Equity, its parents, subsidiaries, affiliates, officers and directors, any entity in which Equity has a controlling interest, all customers who make a timely

election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

97.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

98.     The Classes consist of thousands of members, such that joinder of all Class members is impracticable.

99.     There are questions of law and fact that are common to the Class members that relate to Equity's practice of charging Overdraft Fees on transactions that did not overdraw an account and charging multiple NSF Fees on an account.

100.    The claims of Plaintiff are typical of the claims of the proposed Class because they are based on the same legal theories, and Plaintiff has no interests that are antagonistic to the interests of the Class members.

101.    Plaintiff is an adequate representatives of the Classes and has retained competent legal counsel experienced in class actions and complex litigation.

102.    The questions of law and fact common to the Classes predominate over any questions affecting only individual Class members, particularly because the focus of the litigation will be on Equity's conduct. The predominant questions of law and fact in this litigation include, but are not limited to, whether Equity:

- Imposed Overdraft Fees on transactions that did not overdraw an account and multiple NSF Fees, or an NSF Fee followed by an overdraft fee, on the same item;

- Breached its contract with Plaintiff and Class members;

- Breached the covenant of good faith and fair dealing imposed on it; and

- Was unjustly enriched.

103.     Other questions of law and fact common to the Classes include the proper method or methods by which to measure damages.

104.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of hundreds of individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the common issues of the Class members to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Equity, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and Equity's misconduct will proceed without remedy. In addition, without a class action, it is likely that many members of the Class will remain unaware of Equity's conduct and the claims they may possess.

105.     It appears that other persons who fall within the Class definitions set forth above are not pursuing similar litigation, such that individual Class members do not wish to control the prosecution of separate actions.

106.     This proposed class action does not present any unique management difficulties.

### COUNT I: BREACH OF CONTRACT
### (*On behalf of Plaintiff and the Class*)

107.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

108.     Plaintiff and Equity have contracted for bank account deposit, checking, and debit card services.

23

109.	Equity misconstrued in the account documents its true debit card processing and Overdraft Fee practices and breached the express terms of the account documents.

110.	No contract provision authorizes Equity to charge Overdraft Fees on transactions that did not overdraw an account.

111.	Equity breached the terms of its account documents by charging Overdraft Fees on transactions that did not overdraw an account.

112.	Equity breached the terms of its account documents by charging multiple NSF Fees on the same item, or an NSF Fee followed by an Overdraft Fee.

113.	Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the contract.

114.	Plaintiff and members of the Class have sustained damages as a result of Equity's breach of the contract.

## COUNT II: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (*On Behalf of Plaintiff and the Class*)

115.	Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

116.	Plaintiff and Equity have contracted for bank account deposit, checking, and debit card services.

117.	A duty of good faith and fair dealing is imposed on contracts between banks and their customers because banks are inherently in a superior position to their checking account holders because from a superior vantage point they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

118.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

119.    Equity has breached the covenant of good faith and fair dealing in the contract through its policies and practices as alleged herein.

120.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the account documents.

121.    Plaintiff and members of the Class have sustained damages as a result of Equity's breach of the covenant of good faith and fair dealing.

### COUNT III: UNJUST ENRICHMENT
### (*On Behalf of Plaintiff and the Class*)

122.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

123.    Plaintiff and members of the Class conferred a benefit on Equity at the expense of Plaintiff and members of the Class when they paid improper NSF Fees or Overdraft Fees.

124.    Equity appreciated this benefit in the form of the substantial revenue that Equity generates from the imposition of such fees.

125.    Equity has accepted and retained such fees under inequitable and unjust circumstances.

126.    Equity should not be allowed to profit or enrich itself inequitably and unjustly at Plaintiff' and the Class's expense and should be required to make restitution to Plaintiff Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and judgment as follows:

A.  Certification for this matter to proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  Restitution of all Overdraft Fees paid to Equity by Plaintiff and the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

C.  Actual damages in an amount according to proof;

D.  Pre- and post- judgment interest at the maximum rate permitted by applicable law;

E.  Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

F.  For attorneys' fees under the common fund doctrine, and all other applicable law; and

G.  Such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands a trial by jury.

Dated: November 5, 2020

Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

_/s/ Matthew L. Dameron_
Matthew L. Dameron        MO Bar No. 52093
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Tel:     (816) 945-7135
Fax:     (816) 945-7118
matt@williamsdirks.com

Taras Kick (_pro hac vice_ forthcoming)
Jeffrey Bils (_pro hac vice_ forthcoming)

26

**THE KICK LAW FIRM, APC**
815 Moraga Drive
Los Angeles, California 90049
Tel:     (310) 395-2988
Fax:     (310) 395-2088
taras@kicklawfirm.com
jeff@kicklawfirm.com

Jeffrey Kaliel (*pro hac vice* forthcoming)
Sophia Gold (*pro hac vice* forthcoming)
**KALIEL PLLC**
1875 Connecticut Avenue NW
10th Floor
Washington, D.C. 20009
Tel:     (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

***Counsel for Plaintiff and the Proposed Class***